UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Nicole W.,  )
             )
    Plaintiff,  )
             )
v.           )  No. 18 CV 50292
             )  Magistrate Judge Lisa A. Jensen
Andrew Saul, )
Commissioner of Social Security, )
             )
    Defendant.  )

# MEMORANDUM OPINION AND ORDER[1]

Plaintiff, who is now 45 years old, has suffered from rheumatoid arthritis since she was 16 years old. Despite this condition, she was able to work full-time during most of this period, including a 21-year stint at a factory. However, in September 2015, she stopped working at the factory because her symptoms became too debilitating. She was missing a lot of work, and on some days, could barely walk when she got home. She had swelling and pain in her fingers, wrists, hands, knees, and ankles. She was taking Percocet, Gabapentin, and Prednisone to alleviate the pain and arthritic symptoms. She had problems getting enough sleep and struggled to do daily activities like housecleaning. She also suffered from depression, taking Zoloft, Amitriptyline, and Depakote to treat this condition.

In October 2015, a month after she stopped working, plaintiff filed for Title II disability benefits. A hearing was held before an administrative law judge ("ALJ"). Plaintiff testified about her symptoms and limitations as described above. A vocational expert also testified, but no medical expert was called by the ALJ. At the end of the hearing, plaintiff's counsel argued that

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

1

plaintiff's testimony was sufficient to show that she either met or equaled Listing 14.09 ("Inflammatory arthritis"). This listing contains four alternative tests (subsections A, B, C, or D), and plaintiff's counsel argued that she met subsection D. Counsel asked the ALJ, if he were in doubt about whether plaintiff met this listing, to "proffer the file to a medical expert for interrogatories." R. 58. The ALJ chose not to do so for reasons unknown.

On March 22, 2018, the ALJ issued a written ruling finding plaintiff not disabled. At Step Three, the ALJ considered whether plaintiff met several listings, one of which was 14.09. The ALJ concluded that plaintiff did not meet this listing based on the following analysis:

> With regard to listing 14.09, the evidence fails to demonstrate the requisite degree of inflammation, deformity, ankylosing spondylitis, spondyloarthropathy. Additionally there is no evidence that the claimant has marked limitations in activities of daily living, social functioning, or ability to complete tasks.

R. 18. In the ensuing RFC analysis, the ALJ discussed plaintiff's medical history and testimony and concluded that plaintiff was able to do sedentary work. The ALJ found plaintiff's testimony not fully credible because, among other things, the ALJ believed that the physical examinations did not document "the type of abnormalities one would expect to see." R. 20. The "one" doing the expecting here was presumably the ALJ, based on the fact that the ALJ gave "little weight" to the opinions from the agency physicians and did not otherwise rely on any medical opinion.

## DISCUSSION

Plaintiff seeks a remand based on two related arguments. The primary one is that the ALJ failed to explain why he found plaintiff did not meet Listing 14.09D. Plaintiff's fallback argument is that the ALJ should have obtained an expert opinion on this question. The arguments turn on the same underlying question. Because the Court finds that a remand is warranted under the first argument, the Court will not address the second one.

We can begin on a point of agreement. Both sides agree that the ALJ's two-sentence analysis of Listing 14.09 was conclusory. The ALJ basically just parroted some of the language from the listing. There was no explanation or analysis to enable this Court to trace the path of the ALJ's reasoning, no "logical bridge" from the evidence to the conclusion. *See Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Despite this shortcoming, the Government argues that the ALJ's decision nonetheless should be affirmed. The basic argument is that the evidence was so thin that there was not even a colorable argument that plaintiff could conceivably meet (or equal) this listing. The Government offers two alternative legal frameworks to support this contention. The first and somewhat novel theory is that plaintiff was required to make a prima facie case at the hearing, and that she failed to make this threshold showing. In support of this theory, the Government cites to two Seventh Circuit cases from the early 1990s, and a D.C. Circuit case from 2003. Dkt. #18 at 2. The two Seventh Circuit cases are not Social Security disability cases but are instead federal statutory discrimination cases applying the *McDonnell Douglas* burden-shifting framework. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793 (7th Cir. 1995) (claim under the Americans with Disabilities Act); *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257 (7th Cir. 1993) (claim under Title VII).[2] The Government's alternative theory is the harmless error doctrine, which allows this Court to affirm if it can conclude with certainty and great confidence that the ALJ would reach the same conclusion absent the error. *See Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010). The mere possibility that the ALJ would reach the same conclusion is not enough. *Id.* at 353 ("[T]he fact that the administrative law judge, had she considered the entire record, might have reached the

---

[2] The case from the D.C. Circuit—*Krishnan v. Barnhart*, 328 F.3d 685 (D.C. Cir. 2003)—is a Social Security case, but plaintiff has made no argument that the Seventh Circuit has relied on it as persuasive authority or otherwise followed its reasoning.

3

same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different outcome."). In considering these two frameworks, the Court finds that the latter one makes more sense given that it is more clearly recognized for disability cases.

The central issue, then, is whether there is enough evidence to show that the ALJ might reach a different result on remand. Listing 14.09D states as follows:

> **D.** Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

This listing can be broken down into three requirements: (i) repeated manifestations; (ii) two constitutional symptoms or signs; and (iii) one marked limitation.

The parties discuss these requirements in their briefs. After reviewing the arguments and the relevant portions of the record, the Court finds that plaintiff has pointed to enough evidence to make a *colorable* argument that the ALJ might find, after making a more in-depth analysis and after consulting with a medical expert, that plaintiff could meet this listing. It should be emphasized that the Court is not suggesting that plaintiff is likely to succeed; in fact, the Court has doubt that she can. But the Court cannot say this with certainty and great confidence.

The Court will go through the three requirements, not all of which are in dispute. As an initial observation, the Court notes that neither side has discussed the legal requirements or evidence in great detail. Overall, the briefs are relatively short; the Government's response is seven pages with only three pages devoted to the primary question of whether plaintiff could

meet the listing. The Government also did not attempt to distinguish *Thornton v. Comm'r of Soc. Sec.*, No. 11-CV-15527, 2013 WL 592442 (E.D. Mich. Jan. 10, 2013), *report and recommendation adopted sub nom. Thornton v. Astrue*, No. 11-15527, 2013 WL 588995 (E.D. Mich. Feb. 14, 2013), the main case relied on by plaintiff.[3] As discussed below, Listing 14.00 contains helpful guidance on how to interpret some of the provisions in dispute here. But neither side utilized this guidance. With these comments out of the way, the Court now turns to the specific requirements.

The first requirement asks whether the claimant had "repeated manifestations of inflammatory arthritis." In her opening brief, plaintiff cites to evidence she believes shows that this requirement could be met. Specifically, she had fused wrists, hip pain, knee swelling, and ankle tenderness, all these symptoms being found on multiple doctor visits; she missed a number of days of work; she was taking Prednisone and Oxycodone for pain; and her doctor noted that she "easily flares after doing household chores." Dkt. #11 at 8. The Court need not assess whether this evidence is sufficient because the Government has not argued that it is insufficient. *See* Dkt. #18 at 3. By not offering any counter-argument, the Government has conceded that plaintiff has made a colorable argument for meeting this first requirement.[4]

---

[3] The Government takes the position that plaintiff's opening brief was so inadequate that no in-depth response was required. Consistent with this view, the Government asks that this appeal be "summarily dismissed." Dkt. #18 at 3.

[4] As a side note, the Court notes that plaintiff claims that the phrase "repeated manifestations" is "not defined by 14.09D or by the preface" to Listing 14.00. Dkt. #11 at 7. But this does not appear to be true. Listing 14.00 contains the following guidance in the preface:

> As used in these listings, "repeated" means that the manifestations occur on an average of three times a year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of three times a year or once every 4 months but last substantially longer than 2 weeks. Your impairment will satisfy this criterion regardless of whether you have the same kind of manifestation repeatedly, all different manifestations, or any other combination of manifestations; for example, two of the same kind of manifestation and a different one. You must have the required number of manifestations with the frequency and duration required in this section. Also, the manifestations must occur within the period covered by your claim.

But the Government does argue that plaintiff cannot meet the remaining two requirements—or, more precisely, the claim is that plaintiff, in her opening brief, did not even attempt to make an argument that all parts of these two requirements could be met.

To meet the second requirement, a claimant must have two of the following four constitutional symptoms or signs: severe fatigue, fever, malaise, or involuntary weight loss. The Government argues that plaintiff has "only argued one constitutional sign," which is fatigue. Dkt. #18 at 3. The Court construes this statement to mean that the Government is conceding that plaintiff has a colorable argument for showing severe fatigue. The only question then is whether plaintiff could establish one of the other three signs or symptoms. Plaintiff does not argue that she had either fever or involuntary weight loss. So the analysis turns on whether she could show malaise. The Government's position is that plaintiff did not even try to make an argument that she had malaise. Therefore, the listing argument is doomed.

Although it is a close call, the Court is not persuaded for two reasons. First, the Court finds that a sympathetic reading of plaintiff's brief indicates that she did make an argument in her opening brief, albeit a brief one, that she could meet the malaise requirement. The argument is intertwined with her extended discussion of *Thornton*, No. 11-CV-15527, 2013 WL 592442— a case plaintiff believes is factually and analytically very similar to the present case. In *Thornton*, the court rejected a harmless error argument and remanded for a more detailed analysis of Listing 14.09D. The court remanded even though it found some of the claimant's evidence to be ambiguous and even though it had doubt about the ultimate viability of the argument. Plaintiff here noted that the *Thornton* court essentially lumped severe fatigue and malaise together in the same analysis. Dkt. #11 at 8. Plaintiff then argued that she met the fatigue requirement. A fair

---

Listing 14.00I.3. On remand, the ALJ and the parties should use this framework to anchor the analysis.

reading of this argument is that plaintiff believed she met both requirements, relying on the same line of evidence for each. In sum, the Court finds that although plaintiff's argument is thin, it is unfair to say it was non-existent. For this reason, the Court is not willing to find that it is waived, as the Government urges.

Second, and related to the first argument, the Court notes that the definitional section for Listing 14.00 states the following:

> *Constitutional symptoms or signs*, as used in these listings, means severe fatigue, fever, malaise, or involuntary weight loss. *Severe fatigue* means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. *Malaise* means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function.

14.00C.2 (emphasis in original). A comparison of the definitions for severe fatigue and malaise shows that they are similar. Notably, both conclude with the same phrase—"significantly reduced physical activity or mental function." Given that both definitions hinge on this same test, it would seem odd to argue that plaintiff could meet the severe fatigue requirement (as the Government concedes) but could not meet the malaise requirement. For these reasons, the Court finds that plaintiff has raised a colorable argument that the second requirement has been met.

This brings us to the third requirement. It presents another obstacle to plaintiff's argument. Here again, the Government argues for a waiver based on plaintiff's alleged failure to make an argument. But the Court finds, based on a charitable reading, that plaintiff did make an argument that this requirement has been met. The argument is on page 4 of the opening brief. In this discussion, plaintiff lumps all three limitations together—daily living, social functioning, and completing tasks—and then argues that they could be met based on the evidence that plaintiff had crippling depression and crippling pain for which she took Percocet, and evidence that she could not do basic household chores due to persistent swelling in her hands and ankles.

7

Dkt. #11 at 4. One could pick at this argument by noting, among other things, that plaintiff has failed to separate out the three limitations so that they could be analyzed individually. The argument that she had a marked limitation in social functioning, for example, seems especially weak. Plaintiff also has not discussed the evidence in much detail; her presentation is just half a paragraph. She has not addressed contrary lines of evidence such as the fact that she could drive and shop to some degree. But on the other hand, the Government's brief is likewise threadbare. The Government has not attempted to marshal the counter-evidence. The Court is left with an unclear picture. To be sure, a marked limitation is a significant limitation. However, as the prefatory comments to Listing 14.00 indicate, a person who has a marked limitation "need not be totally precluded from performing an activity" and need not "be confined to bed, hospitalized, or in a nursing home." *See* Listing 14.00I.5. Also, a marked limitation may be found where the symptoms are only intermittent rather than persistent. *See* Listing 14.00I.4.

In considering all three requirements, which overlap in a general sense, the Court notes that neither the ALJ nor the Government gave much attention to plaintiff's written statements, as well as those of her husband, and also to plaintiff's hearing testimony about her condition and limitations. *See* Exs. 6E, 7E, 10E, 11E. The written statements provide some of the strongest evidence that she met the three requirements. To illustrate, here is one of plaintiff's answers on one of her Function Reports:

5. How do your illnesses, injuries, or conditions limit your ability to work?

> every joint in my body hurt I have to pace myself in everything I do I can't left my arms over my head my back hurts so I can't do a lot of standing walking is out of the questions my knees hurt every time I take a step my right ankle only can take a little standing my hands hurt all the time it just won't lift up plus both hips hurt. I just won't to die all the time

R. 267. On another form, plaintiff gave the following statement:

> Please write any additional information you did not give in earlier parts of this report. If you did not have enough space in the sections of this report to write the requested information, please use this space to tell us the additional information requested in those sections. Be sure to show the section to which you are referring.
>
> I HAVE HAD RA SINCE I WAS 16 YEAR OLD. I LIKED WORK I HAD A GOOD JOB AND I WAS GOOD AT IT. WHILE I WORKED I WAS IN SO MUCH PAIN I WOULD IN UP MISS 4 DAY A MONTH DEPENDING WHAT JOB I DID THE DAY BEFORE. I WOULD MISS MORE I COULD NOT COOK OR CLEAN BECAUSE MY ANKLE AND KNEE HURT SO BAD. MY ANKLE WOULD HURT SO BAD THAT AL I DO WHEN I GOT HOME FROM WORK OR AFTER CLEANING UP MY HOUSE IS LAY DOWN SOMETIME I HAD TO CRAWL UP THE STAIR AND TO THE BATH ROOM. I COULD NOT SLEEP BECAUSE OF THE PAIN. I COULD NOT TAKE CARE OF MY DAUGHTER I WAS MISSING SO MANY DAY OF WORK THAT I WAS BEHIND ON MY CAR AND HOUSE PAYMENT. OVER THE YEARS I BEEN ON SO MANY DRUGS NONE WORK RIGHT NOW I DONT THINK ANY WILL. I GET SO DEPRESS ABOUT MY RA THAT I WANTED TO KILL MY SELF ON SEVERAL OCCASION. I STILL BATTLING DEPRESS BECAUSE IT NOTHING I CAN DO BUT QUIT THINGS LIKE MY JOB.

R. 217. The ALJ only briefly mentioned these statements, leaving out the details. *See* R. 19.

The Court understands that the ALJ was not required to believe these statements completely and unqualifiedly. This leads us to the ALJ's credibility analysis. The Court believes that this is an important—and underexplored—part of the decision. Surprisingly, plaintiff did not make any direct argument attacking it, although plaintiff did indirectly cast doubt on it. The ALJ found that plaintiff's testimony was not entirely credible. Although this finding means that the ALJ did not credit all of plaintiff's statements in their entirety, presumably including the two above, there are unresolved questions about this finding.

9

One problem is vagueness. It is not clear what aspects of plaintiff's testimony and statements were found to be unbelievable. For example, the ALJ did not state what activities he believed plaintiff was still capable of doing and how frequently plaintiff could do them. These specific findings are relevant in assessing, for example, whether plaintiff had marked limitations in activities of daily living.

Another problem is that the analysis was incomplete. The ALJ did not consider all of the factors typically considered in a credibility analysis. *See* SSR 16-3p. For example, the ALJ did not meaningfully consider plaintiff's medication history. Around the time she filed her applications, she was taking numerous medications, including Amitriptyline, Azathioprine, Citalopram, Divalproex, Orencia, Percocet, and Prednisone. R. 212. In addition, she had tried various medications over the years. For example, she took Actemra, a medication for rheumatoid arthritis, but stopped because she could no longer afford it. R. 41. In the credibility analysis, the ALJ gave little attention to these facts. The ALJ only made a few passing references to this issue, stating, for example, at the end of the opinion that plaintiff had "failed multiple pharmacological treatments." R. 23. But the ALJ did not delve into these facts or, apparently, give them any weight. On remand, the ALJ should consider this issue, and the other credibility factors, in greater detail. *See generally* SSR 16-3p ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent").

The final problem is that the ALJ did not call a medical expert and did not otherwise rely on any medical opinion. As a result, the ALJ's analysis necessarily involved doctor playing. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018). Plaintiff raised this concern in her brief,

arguing that the ALJ relied on findings such as normal muscle mass and tone, which according to plaintiff are not proper facts for assessing "joint related concerns" or the 14.09D requirements. Dkt. #11 at 6. A medical expert is especially important for assessing the more diffuse question of whether plaintiff *equaled* the listing.

One final suggestion going forward. On remand, plaintiff could strengthen her argument that she met this listing if she were to get an opinion from a treating physician. The record indicates that she has treated with Dr. Rovinder Singh Saini since 2000. R. 215. Dr. Saini may be able to provide a longitudinal perspective that the ALJ would find persuasive.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings.

Date: February 4, 2020　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　　　Lisa A. Jensen
　　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge