UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Nicole W., ) | |
| ) | |
|    *Plaintiff*, ) | |
| ) | |
| v. ) | No. 18 CV 50292 |
| ) | Magistrate Judge Lisa A. Jensen |
| Andrew Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
|    *Defendant*. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Commissioner's motion asking this Court to reconsider its decision remanding this case so that the administrative law judge ("ALJ") can provide an explanation for why Plaintiff, who has rheumatoid arthritis, did not meet listing 14.09D.[1] This motion has been fully briefed, and we now have two full sets of briefs on the questions herein. As the Commissioner recognizes, to prevail on its Rule 59(e) motion, it must "clearly establish" that this Court "committed a manifest error of law."[2] *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012). The Commissioner's argument, in a nutshell, is that this Court should have applied a strict burden-shifting framework that puts the onus on the Social Security claimant. This was the Commissioner's main argument the first time around, and it has now bolstered the argument with more cases.

After reviewing these arguments with a fresh eye, the Court still believes this case should be remanded, but the Court recognizes that the case law in this area is complex with many cases

---

[1] The 11-page Memorandum Opinion and Order sets forth background information, which will not be repeated here. *See Nicole W. v. Saul*, No. 18 CV 50292, 2020 WL 550603 (N.D. Ill. Feb. 4, 2020).
[2] The Commissioner makes no argument that there was any factual error or newly discovered evidence.

1

to potentially rely on. However, on balance, the Court finds that the harmless error framework it applied is better supported by the case law than the claimant-unfriendly framework the Commissioner asserts is controlling law.

To recap this Court's reasoning, it consisted of two basic steps. The Court first found that the ALJ's conclusory two-sentence listing analysis was inadequate because the ALJ "basically just parroted some of the [listing] language." *Nicole W.*, 2020 WL 550603, at *2. The ALJ provided no clue about his reasoning. Did he find that none of the requirements were met or some of them? Was it a close call or was there zero evidence? (He presumably believed there was some evidence otherwise he would not have mentioned this listing just as he did not mention the great majority of 100-plus available listings.) How did he interpret the specific requirements? Did he consider the separate question of equivalence? The answers to these questions remain locked in a virtual black box because the ALJ only provided a conclusory statement. Given these facts, this Court quickly reached the initial conclusion that the analysis was inadequate. It was a conclusion that is hard to dispute, and the Commissioner made no attempt to do so. As we observed, the ALJ failed to comply with the overarching duty of providing enough information to allow this Court to trace the path of the ALJ's reasoning. In addition, the ALJ's analysis failed to comply with the Seventh Circuit's more particular rule regarding listing analyses which states as follows: "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) ("This is the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing."). In sum, the

ALJ erred by providing only a perfunctory analysis. But this finding was really just the start of the analysis.

The second and more difficult question was whether the decision could still be affirmed based on the fact that some questions or doubts existed about whether Plaintiff could meet the listing on remand. This question has arisen often in Social Security disability cases, and courts have taken differing approaches. In this case, this Court analyzed the question under the harmless error framework, one of two approaches the Commissioner suggested, although it was the second and less preferred approach.[3] The Commissioner's first and primary argument was that this Court should apply a burden-shifting approach in which Plaintiff must first make out a prima facie case. The Commissioner supported this theory with several older out-of-Circuit cases; with two Seventh Circuit Title VII cases, from the early 1990s, applying the *McDonnell Douglas* burden-shifting framework; and with a few other Seventh Circuit Social Security cases. The Court previously found this theory to be somewhat novel and continues to find it to be so. Among other things, this Court is unaware of cases applying or analogizing to the *McDonnell Douglas* framework. Also, the Court had not seen this precise terminology (*e.g.* "prima facie" and "dual burden") in previous Social Security cases or briefs. For example, the Commissioner asked that Plaintiff's appeal be "summarily dismissed." Dkt. #18 at 2, 3. All Social Security cases in this Court are decided on summary judgment. Was the Commissioner suggesting an even more summary dismissal, perhaps analogous to a motion to dismiss? More generally, the burden placed on claimants by the Commissioner's theory seemed at odds with the larger Social

---

[3] Magistrate Judge Iain D. Johnston applied this same framework and reached the same result in *Patterson v. Berryhill*, No. 17 CV 50202, 2018 WL 6830331, *3 (N.D. Ill. Dec. 28, 2018) ("Here, despite some doubt about whether Plaintiff can prevail on remand, the Court is not persuaded that the harmless error doctrine should be applied."). Both sides cited to *Patterson* in the first round of briefing. The Commissioner did not file a motion to reconsider in that case.

Security administrative process particularly cases involving *pro se* claimants. *See Sims v. Apfel*, 530 U.S. 103, 112 (2000) ("[A] large portion of Social Security claimants either have no representation at all or are represented by non-attorneys."). Finally, why the need to rely on older out-of-Circuit cases when there is a large body of Seventh Circuit cases to work with?

The Court did not further explore these questions but instead applied the harmless error doctrine, which again was an approach the Commissioner offered as one alternative. This doctrine provides that an ALJ's deficient listing analysis can be affirmed if this Court can conclude with "great confidence" that the claimant could not prevail on remand. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is *overwhelmingly supported by the record* though the agency's original opinion failed to marshal that support, then remanding is a waste of time.") (emphasis added). The phrase "great confidence" was the lodestar in the analysis. In applying that standard, the Court considered the evidence and arguments presented by Plaintiff in her opening and reply briefs. (The Commissioner, as will be discussed, chose not to respond to most of these arguments.) The Court concluded that, although some doubt existed about whether Plaintiff ultimately would be successful, this doubt did not rise to the level to meet the "great confidence" standard. This Court continues to believe that this decision, although close, was the right one.

In its motion, the Commissioner returns to its original prima facie theory. The Court will begin by trying to fully articulate the theory. In reading the Commissioner's three briefs, the Court was not always sure how the theory was supposed to work, but the following is the Court's best understanding. According to this theory, a Social Security claimant trying to qualify as disabled under a listing faces "dual burdens of production and persuasion." Dkt. #18 at 1. These

4

burdens begin at the administrative level. To satisfy the burden of production, the claimant must first make out a prima facie (or colorable) case to the ALJ. If the claimant fails to do so, then the ALJ is free to dismiss the argument with a conclusory explanation, just as the ALJ did here. The prima facie standard, as envisioned by the Commissioner, is fairly rigorous. For example, if a listing contains 10 requirements, and if the claimant only provides evidence regarding 9 of them, the ALJ can summarily dismiss the argument and may do so without telling the claimant which of the 10 requirements, if any, were met or were not met.

These dual burdens continue into the district court with the process repeating itself. In the district court, the claimant again must first demonstrate that the listing requirements are met. If she fails, then the district court may, just as the ALJ did, summarily dismiss this argument. The Commissioner portrays this process as being relatively easy and rote, with the court going through a checklist process to see if each requirement was met. Also if the plaintiff's opening brief fails to make an argument regarding every single requirement, then the Commissioner may simply note this failure and stop its argument there. This is what the Commissioner did here.

Having summarized the theory, the Court can note a few initial caveats and observations. To be fair, the Commissioner, has never used the word "theory" nor has it even claimed that it is making a good-faith argument for the extension of the law. Rather, it has presented this framework as being well-established. Another caveat is that this Court initially was uncertain whether the Commissioner was arguing that the claimant had to make out a prima facie case twice—first to the ALJ and then again to the district court—or whether the duty only kicked in at the district court level. In a few places, the Commissioner made statements suggesting the latter interpretation. However, upon closer examination, the Court believes the argument is that the dual burden must be satisfied twice. *See* Dkt. #23 at 5 ("[P]laintiff's burden to present a prima

facie case preceded any obligation on the part of the ALJ to provide greater articulation."). This interpretation is also supported by the Commissioner's reference to the burden as being a "continuing" one. Dkt. #26 at 2.

Before considering the legal authorities cited by the Commissioner, it is worth looking at the big picture for a moment. As the Supreme Court has noted, the Social Security system operates on an inquisitorial model rather than an adversarial model. *Sims*, 530 U.S. at 110-11. Under this approach, the ALJ is not a passive spectator with arms folded in a "prove it to me" posture. Rather, the ALJ takes an active role and must independently "investigate the facts and develop the arguments both for and against granting benefits." *Id.*; *Minnick*, 775 F.3d at 938 (finding that ALJs have a duty to develop a full and fair record). The administrative proceedings are informal, and the normal evidentiary rules do not strictly apply. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154-55 (2019).

As for the burden of proof, it is generally stated that the claimant bears the burden through Step Four and then it shifts to the Commissioner at Step Five. *See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). But as one prominent treatise has noted, the issue of the burden of proof is "not as important as it is in normal civil or criminal litigation." Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 2.8, p. 105 (2020 ed.) (hereinafter, "Kubitschek and Dubin"). The reason is that "Social Security cases are not meant to be adversarial proceedings," and ALJs must help claimants develop their cases. *Id.* at 104-05. Finally, the Supreme Court has also repeatedly noted that the statute was "designed to be 'unusually protective' of claimants." *Bowen v. City of New York*, 476 U.S. 467, 480 (1986); *Smith v. Berryhill*, 139 S.Ct. 1765, 1776 (2019) ("claimant-protective statute"). All these points are in tension with the Commissioner's more rigid approach.

6

With this backdrop in mind, we can now consider the Commissioner's authorities. It first relies on two Social Security regulations, although it does not bother to stop and quote them or explain how they support the argument. The first regulation is 20 C.F.R. § 404.1525 (entitled "Listing of impairments in appendix I"). The Commissioner relies on subsections (c)(3) and (d), which state:

> (c)(3) In most cases, the specific listings follow the introduction in each body system, after the heading, *Category of Impairments.* Within each listing, we specify the objective medical and other findings needed to satisfy the criteria of that listing. We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement[.]
>
> \* \* \*
>
> (d) *Can your impairment(s) meet a listing based only on a diagnosis?* No. Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.

The second regulation is 20 C.F.R. § 404.1526 (entitled "Medical equivalence"). The Commissioner relies on subsection (b), which states:

> (b) *How do we determine medical equivalence?* We can find medical equivalence in three ways.
> (1)(i) If you have an impairment that is described in appendix 1, but —
> (A) You do not exhibit one or more of the findings specified in the particular listing, or
> (B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,
> (ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.
> (2) If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.
> (3) If you have a combination of impairments, no one of which meets a listing (see § 404.1525(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at

7

> least of equal medical significance to those of a listed impairment, we will find
> that your combination of impairments is medically equivalent to that listing.
> (4) Section 404.1529(d)(3) explains how we consider your symptoms, such as
> pain, when we make findings about medical equivalence.

The Court is hard pressed to find any clear support for the Commissioner's theory here. Neither of these quotations includes the buzzword phrases identifying the Commissioner's arguments—"prima facie," "burden of production," "burden of proof," "dual burden," or "summary dismissal." The language is more consistent with the inquisitorial framework described in *Sims* where the focus in on the Agency's duties (*e.g.* "we find," "we consider," "we compare," "we determine"). With regard to the burdens, the language tends toward the passive voice, making it unclear who, if anyone, has them.[4] In sum, these two regulations, while not explicitly in conflict with the Commissioner's theory, provide no real support for it either.[5]

The Court next turns to the case law. The Commissioner argues that there a "surfeit" or "litany" of controlling cases "directly on point." Dkt. #23 at 3; Dkt. #26 at 2. The Commissioner cites to these six cases:

- *Lloyd v. Berryhill*, 682 Fed. App'x. 491 (7th Cir. 2017)
- *Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012)
- *Zatz v. Astrue*, 346 Fed. App'x. 107 (7th Cir. 2009)
- *Knox v. Astrue*, 327 Fed. App'x. 652 (7th Cir. 2009)
- *Rice v. Barnhart*, 384 F.3d 363 (7th Cir. 2004)
- *Maggard v. Apfel*, 167 F.3d 376 (7th Cir. 1999)

---

[4] At least one Seventh Circuit case has also used the passive voice. *See Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) ("Each listing has a set of criteria which *must be met* for an impairment to be deemed conclusively disabling.") (emphasis added). Of course, this may just be inadvertent wording.

[5] Another place to look for evidence to confirm the Commissioner's theory is the ALJ's decision. It contains an overview of the law the ALJ was applying—specifically the five-step process. The statement regarding the Step Three inquiry states: "At step three, the *undersigned must determine* whether the claimant's impairments or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listened in [the applicable regulations]." R. 14 (emphasis added). Again, the focus is on the ALJ (*i.e.* the "undersigned").

8

The Court will refer to these cases, in shorthand, as the *Lloyd* cases because it is the most recent case and because, according to the Commissioner, it is the strongest case in its favor.[6] In all these cases, the Seventh Circuit affirmed. In terms of the bottom-line result, these cases do support the Commissioner's argument.

But looking at their specific reasoning, they yield a murkier picture. To be sure, there are some general statements supporting the Commissioner's theory or parts of it. One of the stronger ones is this statement in *Knox*: "Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by the listing." 327 Fed. App'x. at 655. *Lloyd* states at one point that the claimant "needed to show" that she met a particular listing requirement and then observes that she "did not make a showing." 682 Fed. App'x. at 496. A number of cases include a general statement to the effect that claimants must "show" or "satisfy" or "prove" all the listing criteria were met. *See, e.g.*, *Maggard*, 167 F.3d at 380 ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). The Supreme Court made a similar statement in *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Although these statements are loosely consistent with the Commissioner's theory, the Court is not convinced that these courts were explicitly adopting the framework in the strict and unforgiving manner urged here. First, these decisions generally do not contain the phrases "prima facie" or "summary dismissal" or "burden of production."[7] If this framework were controlling it seems reasonable to expect it would be laid out more openly and clearly. Second, these statements did not appear to play a major role in the analysis, as they are not discussed in

---

[6] Four of the six cases (*Lloyd*, *Zatz*, *Knox*, and *Maggard*) were not cited by the Commissioner in the first round of briefing.

[7] This fact may explain why the Commissioner originally resorted to citing to the older out-of-Circuit cases and Title VII cases. Those cases include some of the buzzword phrases.

9

detail. Third, many of these decisions could be read as being compatible with this Court's approach. For example, unlike Plaintiff here, the claimant in *Knox* did not present "any" evidence of meeting the listing. 327 Fed. App'x. at 655. Likewise, in *Filus*, the Seventh Circuit twice stated that the claimant had "no evidence" to support parts of the listing. 694 F.3d at 867-68. If Plaintiff here had offered *no* evidence, then this Court would have affirmed under the harmless error doctrine. In *Lloyd*, the Seventh Circuit stated several times that the ALJ erred in the listing analysis (a finding contrary to the Commissioner's contention here that the ALJ purposely chose to provide only a conclusory analysis) and the Seventh Circuit relied in part on the harmless error doctrine (the same framework this Court used). 682 Fed. App'x. at 496 ("We agree that the ALJ erred by omitting discussion of Listing 1.03, but any error was harmless.").

Third, three of the six cases the Commissioner asserts are controlling authority are unpublished decisions—specifically, *Lloyd*, *Zatz*, and *Knox*. Under Seventh Circuit Rule 32.1(b), they cannot be "treated as precedents." This fact weakens the line of cases, especially given that the allegedly strongest case (*Lloyd*) is one of the unpublished ones.

But the biggest barrier to accepting the Commissioner's reliance on these cases is the fact that the Commissioner, at least not until its final reply brief and then only in a brief fashion, never acknowledged and thus never attempted to rebut or reconcile a well-known competing line of cases. They include the following:

- *Minnick v. Colvin*, 775 F.3d 929 (7th Cir. 2015)
- *Kastner v. Astrue*, 697 F.3d 642 (7th Cir. 2012)
- *Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006)
- *Barnett v. Barnhart*, 381 F.3d 664 (7th Cir. 2004)
- *Blakes v. Barnhart*, 331 F.3d 565 (7th Cir. 2003)
- *Steele v. Barnhart*, 290 F.3d 936 (7th Cir. 2002)[8]

---

[8] This list is not exhaustive.

In all these cases, the Court remanded based in part on the listing analysis being problematic. We will refer to these as the *Minnick* cases. In Plaintiff's three briefs, she continually cited to these cases.

As with the *Lloyd* cases, the *Minnick* cases have some individual variations, and none of them speak directly or definitively to the Commissioner's theory. But on the whole, the Court finds them persuasive. Two stand out. The first is *Minnick*. The Seventh Circuit there first concluded that the listing analysis was deficient under the long-recognized rule that a perfunctory analysis is inadequate. Then, in a fairly brief discussion, the Seventh Circuit concluded that the ALJ "failed to acknowledge *several aspects* of the record that *could* in fact meet or equal Listing 1.04." 775 F.3d at 936 (emphasis added). The Seventh Circuit also stated that the claimant "may well" have satisfied the listing. *Id.* This contingent language ("could and "may") is not consistent with the Commissioner's theory that the claimant "must" definitively prove her case to get a remand.

The second case is *Ribaudo* where the Seventh Circuit acknowledged the competing duties and burdens:

> Ribaudo has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing. *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir.1999). **But this court has also held that** an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a "perfunctory analysis," may require a remand. *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004); *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003); *see also Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir.2002).

458 F.3d at 583 (emphasis added). The Commissioner's argument relies on the first sentence and then basically ignores the rest. But the word "but" is important, along with the word "also." They suggest the ALJ's duty to provide a non-perfunctory analysis is not dependent on the claimant first meeting a prima facie burden. And the proof is in the pudding. The Seventh Circuit

11

remanded, despite reciting this same rule the Commissioner now relies on as being dispositive, and it did so without conducting the type of rigorous and exacting review now envisioned by the Commissioner. The Seventh Circuit noted that the plaintiff had presented "contradictory evidence suggesting that his impairment meets Listing 1.04A" and then noted that the ALJ should have discussed this evidence because it "potentially" supported the listing argument. *Id.* at 584. Here again, the language speaks of possibilities, not certainties.

In sum, although the Commissioner has cited to some cases supporting its position, the Court is not persuaded that its theory has been clearly adopted as the controlling law.[9] Moreover, even if it is true that claimants have an initial prima facie burden, an argument can be made that it was satisfied here. At the end of the administrative hearing, counsel specifically argued that Listing 14.09D was met and described in general terms the evidence to support the argument. R. 57-58. So this is not a case of sandbagging.[10]

In this case, Plaintiff also arguably made out a prima facie case. In her opening brief, she focused mostly on the first of three main requirements of Listing 14.09D, which asks whether she had "repeated manifestations of inflammatory arthritis." She discussed, among other things, her hospitalization, her pain medications, the physical examination findings, and her difficulties doing tasks around the house. Dkt. #11 at 3-5, 8. She cited to specific portions of the record. *See, e.g.*, R. 316, 359, 360, 387, 398, 405, 410, 414, 434, 531, 550, 552, 562, 574. She also briefly argued that this same evidence supported the last of the three requirements (marked limitations). Dkt. # 11 at 4. Plaintiff then anticipated the harmless error argument the Commissioner might

---

[9] As an aside, the Commissioner's decision to ignore the *Minnick* line of cases (it only addressed them briefly in its final reply brief) was not a persuasive approach and it weakened the overall credibility of its arguments.

[10] It is true that counsel only briefly argued the point, but it is not clear whether anything more formal was expected.

raise and argued it should not apply because, even if there were some doubt, the appropriate remedy was a remand. In this argument, Plaintiff relied heavily on *Thornton*, a case from the Eastern District of Michigan, where the court remanded despite having some doubts about whether the claimant met this same listing. *Thornton v. Comm'r of Social Security*, No. 11-CV-15527, 2013 WL 592442 (E.D. Mich. Jan. 10, 2013), report and recommendation adopted *sub nom. Thornton v. Astrue*, No. 11-15527, 2013 WL 588995 (E.D. Mich. Feb. 14, 2013). In discussing *Thornton*, Plaintiff argued that the claimant there had only offered ambiguous evidence about whether she met the second requirement, which required having two of four constitutional signs. The *Thornton* claimant argued that she had severe fatigue and malaise, the same two requirements Plaintiff here was relying on. Plaintiff then argued that she had "similar" evidence as in *Thornton*, but in making this statement, she did not refer to the malaise requirement explicitly even though the prior discussion had been discussing those terms together.

This slip-up, if that is the right word, was the opening the Commissioner seized upon. It argued that Plaintiff's failure to fully and explicitly argue this one requirement meant that her entire argument failed. The Commissioner's argument was simple and short, only requiring three pages and mostly avoiding any discussion of the facts.

In her reply brief, Plaintiff argued that the equivalence issue could not be resolved because there was no viable medical opinion on that question. She also argued that any doubts about whether she could meet the listing could be addressed on remand and suggested the Commissioner was unjustifiably "asking plaintiff to perform an analysis that was the ALJ's responsibility." Dkt. #19 at 4.

In the summary judgment ruling, this Court summarized these back and forth arguments and concluded that Plaintiff had made at least some argument regarding all the listing criteria. In

13

other words, a prima facie case. Whether this meets the Commissioner's stricter understanding of this concept is another question.

Another concern with the Commissioner's argument is that it shortchanges the equivalence argument. As Plaintiff points out, the general premise behind an equivalence analysis is that the claimant cannot meet all the listing requirements—in short, cannot make out a prima facie case. Dkt. #19 at 2 (an equivalence analysis is appropriate when one or more requirements are missing) (citing 20 C.F.R. § 404.1526); *see generally* Kubitschek and Dubin at p. 334 ("In determining whether a claimant's impairment is medically equivalent to a listed impairment, the ALJ and federal courts have considerably greater latitude than they do in determining whether it meets the Listings, when only an exact fit will suffice."). Also, the Seventh Circuit has held that a "finding of medical equivalence requires an expert's opinion on the issue." *Minnick*, 775 F.3d at 935.[11] Here, because the ALJ only gave the State Agency opinions little weight and because no expert was called to testify, this Court has no medical opinion to support the analysis and thus would have to conduct the analysis from scratch.[12]

A few more points before concluding. The Commissioner complains about the Court's observation that Plaintiff might be able to rely "on the same line of evidence" to meet the severe fatigue and malaise requirements. Dkt. #20 at 7. The Commissioner argues that this Court "in essence" concluded that the two requirements were "identical" and that this finding was a manifest legal error based on the canon that statutory terms usually should not be construed to be redundant. Dkt. #23 at 5-6. This argument goes too far. For one thing, the Court did not claim

---

[11] The Commissioner did not acknowledge this rule but instead asserted that the ALJ was not "required to have a medical opinion supporting his step-three finding." Dkt. #18 at 5.
[12] This was a problem this Court noted previously. *See Nicole W.*, 2020 WL 550603, at *5 ("A medical expert is especially important for assessing the more diffuse question of whether plaintiff *equaled* the listing.") (emphasis in original).

that the two terms were necessarily identical, merely that the same "line of evidence" might be relevant to both. Moreover, the Commissioner leaves out the important fact that this conclusion was indirectly supported by the definitional section of the listing. Dkt. #20 at 7. In any event, this canon is not an ironclad rule, as the Supreme Court recently observed. *See Barton v. Barr*, 140 S.Ct. 1442, 1453 (2020) ("[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication. The Court has often recognized: 'Sometimes the better overall reading of the statute contains some redundancy.'").

Another point to note is that the Commissioner has not argued that the ALJ's listing analysis could be supplemented by relying on statements made in the later RFC analysis. This is an approach the Seventh Circuit has taken in some cases. *See Curvin v.* Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("This [RFC] discussion provides the necessary detail to review the ALJ's step 3 determination in a meaningful way. We do not discount it simply because it appears elsewhere in the decision."); *Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020) (same). This Court did not consider this argument in the first round of briefing because the Commissioner did not raise it and because Plaintiff, twice, made clear there was no basis for it. *See* Dkt. #19 at 3 ("Defendant does not argue that the ALJ essentially considered the Listing elsewhere in the decision or otherwise argue that the Listing analysis itself was not cursory."); Dkt. #11 at 4 (same). Therefore, any argument along this line has been forfeited.

It also should be noted that the Commissioner has not objected in its motion to reconsider the Court's findings that the ALJ failed to seriously consider "plaintiff's written statements, as well as those of her husband, and also [] plaintiff's hearing testimony about her condition and

limitations." Dkt. #20 at 8. The Court discussed how this evidence was potentially relevant to some of the listing requirements. *Id.* at 8-11.

Finally, returning to the original issue of deference, the Commissioner suggests that this case was remanded based on unmoored sympathy for Plaintiff. But this assertion misses the Court's actual holding. It was based on the more demanding harmless error standard rather than the more deferential substantial evidence standard described in *Biestek* as not being a high standard to meet. The Commissioner keeps steering the analysis back to the latter standard, but the Court does not believe the deference normally given to ALJs is justified when they fail to conduct a proper initial review. If the standard on appeal is always the same, then there is little incentive to get things right the first time. In this Court's view, the better approach is to err on the side of remanding so that the ALJ can further develop the record if warranted, by for example calling a medical expert, and can provide a clear analysis. *See generally Smith*, 139 S.Ct. at 1779 ("Fundamental principles of administrative law, however, teach that a federal court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question."). Suppose an ALJ found that a claimant did not meet a listing based on the flipping of a coin or some other arbitrary standard. If that case were appealed, would the district court be required to give the ALJ's decision deference in close cases and would the plaintiff be required to conclusively demonstrate all the listing requirements were met or equaled to justify a remand? The Commissioner's waiver-based approach suggests the answer would be yes, but the Court is not persuaded.

16

## CONCLUSION

For all the above reasons, the Commissioner's Rule 59(e) motion to alter or amend judgment is denied.

Date: July 7, 2020          By: _____
                                                   Lisa A. Jensen
                                                   United States Magistrate Judge